AO 106 (Rev. 04/10)  Application for a Search Warrant



# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  3:18SW120 |
| 1707 Rawlings Street, Richmond, VA 23231 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A | Possession, receipt and distribution of child pornography |

The application is based on these facts:

See attached affidavit, incorporated as if stated herein.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*M. E. Gary-Ford*

*Applicant's signature*

TFO Mary Gary-Ford, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: May 18, 2018

/S/

David J. Novak
United States Magistrate Judge

*Printed name and title*

City and state: Richmond, Virginia

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF: <br> 1707 Rawlings Street, Richmond, VA 23231 | Case No. 3:18SW120 <br><br> FILED UNDER SEAL |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Mary Gary-Ford, having been first duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 1707 Rawlings

Street, Richmond, VA 23231 (hereinafter, the "SUBJECT PREMISES"), further described in

Attachment A, for the things described in Attachment B.  Attachments A and B are incorporated

herein by reference.

2.      I, your Affiant, Mary Gary-Ford, have been a sworn member of the Richmond

City Police Department ("RPD") for over eight years.  I have spent approximately five years

assigned to various special investigative units.  In the course of my employment as a sworn law-

enforcement officer, I have participated in the execution of numerous search warrants resulting in

the seizure of computers, magnetic storage media for computers, other electronic media, and

other items evidencing violations of state and federal laws, including various sections of Title 18,

United States Code §§ 2251, 2252, and 2252A, involving child exploitation and child

pornography offenses.  I am currently assigned to RPD's Computer Crimes Unit, as well as a

1

Task Force Officer ("TFO") assigned to the FBI, Richmond Division Internet Crimes against Children Task Force ("ICAC") for Southern Virginia. I was deputized as a Special Deputy United States Marshall on November 26, 2017. As a deputized United States Marshal, I am authorized to investigate violations of the laws of the United States and have the authority to execute warrants issued under the authority of the United States.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      I have probable cause to believe that the SUBJECT PREMISES contain contraband and evidence of a crime, fruits of a crime, and instrumentalities of violations of: 18 U.S.C. § 2252A (possession, receipt and distribution of child pornography). I submit this application and affidavit in support of a search warrant authorizing a search of the SUBJECT PREMISES, as further described in Attachment A and B, incorporated herein by reference, which is located in the Eastern District of Virginia. Located within the SUBJECT PREMISES to be searched, I seek to seize evidence, fruits, and instrumentalities of the foregoing criminal violations. I request authority to search the entire SUBJECT PREMISES, including the residential dwelling and any computer, communication devices, and electronic media located therein where the items specified in Attachment A may be found, and to seize all items listed in Attachment B as contraband and instrumentalities, fruits, and evidence of crime.

5.      The statements contained in this affidavit are based in part on: information provided by FBI Special Agents, FBI Task Force Agents, and other law-enforcement officers; written reports about this and other investigations that I have received, directly or indirectly, from other law-enforcement agents; information gathered from the service of administrative

2

subpoenas; the results of physical and electronic surveillance conducted by law-enforcement agents; independent investigation and analysis by FBI agents/analysts and computer forensic professionals; and my experience, training, and background as a Special Agent with the FBI. Because this affidavit is being submitted for the limited purpose of securing authorization for the requested search warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested warrant.

## DEFINITIONS

6.     The following definitions apply to this Affidavit and attachments hereto:

a.     **"Erotica,"** as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, legally obscene or that do not necessarily depict minors in sexually explicit conduct.

b.     **"Child Pornography,"** as used herein, is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c.     **Visual depictions** include undeveloped film and videotape, and data stored on computer disk or by electronic means, which are capable of conversion into a visual image, and data which are capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. See 18 U.S.C. § 2256(5).

d.     **Minor** means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

e.   **Sexually explicit conduct** means actual or simulated: (i) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

## TECHNICAL TERMS

7.   Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   **"Computer,"** as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

b.   **"Computer Server"** or **"Server,"** as used herein is a computer that is attached to a dedicated network and serves many users. A web server, for example, is a computer that hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

c.   **"Computer hardware,"** as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to,

4

physical keys and locks).

d.    "**Computer software,**" as used herein, is digital information that can be
      interpreted by a computer and any of its related components to direct the way they
      work.  Computer software is stored in electronic, magnetic, or other digital form.
      It commonly includes programs to run operating systems, applications, and
      utilities.

e.    **Wireless telephone**:  A wireless telephone (or mobile telephone, or cellular
      telephone) is a handheld wireless device used for voice and data communication
      through radio signals.  These telephones send signals through networks of
      transmitter/receivers, enabling communication with other wireless telephones or
      traditional "land line" telephones.  A wireless telephone usually contains a "call
      log," which records the telephone number, date, and time of calls made to and
      from the phone.  In addition to enabling voice communications, wireless
      telephones offer a broad range of capabilities.  These capabilities include: storing
      names and phone numbers in electronic "address books;" sending, receiving, and
      storing text messages and e-mail; taking, sending, receiving, and storing still
      photographs and moving video; storing and playing back audio files; storing
      dates, appointments, and other information on personal calendars; and accessing
      and downloading information from the Internet.  Wireless telephones may also
      include global positioning system ("GPS") technology for determining the
      location of the device.

f.    **Smartphone** is a portable personal computer with a mobile operating system
      having features useful for mobile or handheld use.  Smartphones, which are
      typically pocket-sized (as opposed to tablets, which are larger in measurement),
      have become commonplace in modern society in developed nations.  While the
      functionality of smartphones may vary somewhat from model to model, they
      typically possess most if not all of the following features and capabilities: 1) place
      and receive voice and video calls; 2) create, send and receive text messages;
      3) voice-activated digital assistants (such as Siri, Google Assistant, Alexa,
      Cortana, or Bixby) designed to enhance the user experience; 4) event calendars;
      5) contact lists; 6) media players; 7) video games; 8) GPS navigation; 9) digital
      camera and digital video camera; and 10) third-part software components
      commonly referred to as "apps."  Smartphones can access the Internet through
      cellular as well as Wi-Fi ("wireless fidelity") networks.  They typically have a
      color display with a graphical user interface that covers most of the front surface

of the phone and which usually functions as a touchscreen and sometimes additionally as a touch-enabled keyboard.

g.    **SIM card** stands for a "subscriber identity module" or "subscriber identification module," which is the name for an integrated circuit used in mobile phones that is designed to securely store the phone's international mobile subscriber identity (IMSI) number and its related key, which are used to identify and authenticate subscribers on mobile telephony devices (such as mobile phones and computers). It is also possible to store contact information on many SIM cards.

h.    **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

i.    **Portable media player**: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

j.    **GPS**: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that

6

are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

k.    **Tablet**: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "Wi-Fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

l.    The "**Internet**" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

m.    "**Internet Service Providers**" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including ; to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber.  By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider ("ISP") over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

n.    **Internet Protocol address (or simply "IP address")** is a unique numeric address used by computers on the Internet.  A typical IP address in IPv4 format looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.,*

121.56.97.178).  Newer IP addresses use the IPv6 format, represented as eight groups of four hexadecimal digits with the groups being separated by colons, for example 2001:0db8:0000:0042:0000:8a2e:0370:7334.  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

o.      "The terms "**records**," "**documents**," and "**materials**," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

p.      "**Website**" consists of textual pages of information and associated graphic images.  The textual information is stored in a specific format known as Hyper-Text Mark-up Language ("HTML") and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol ("HTTP").

q.      "**P2P**" stands for the expression "peer-to-peer."  P2P file sharing is a method of communication available to Internet users through the use of special software.  The software enables users to trade digital files through a network that is formed by directly linking computers together, *i.e.*, "peer to peer."  A significant distinction between P2P networks and traditional computer networks is that P2P machines generally communicate directly with each other, rather than through a relatively low number of centrally-based servers.  There are a number of widely used P2P programs, including among others BitTorrent, Shareaza, eMule, Ares, and Gnutella.  Because of the decentralized nature of P2P networks, they are commonly used to collect and trade illegal files, including, for example, copyright violations involving illegally copied music and movies, as well as child

8

pornography.

r.   **"Hash value"** is shorthand for cryptographic hash function value.  Hash values are used to identify with extreme precision almost any digital file, including but not limited to a movie file, still image file, word processing document or even the entire contents of a computer hard drive.  Hash values are obtained through the use of a mathematical algorithm that maps data of arbitrary size (*e.g.*, a 1 MB image file or a 1 GB movie file) to a bit string of a fixed size (a hash value).  The hashing function is designed to be a one-way function, that is, it is infeasible to invert that function and create the original file from the hash value itself.  If an original file remains unaltered then the hash value is replicable, *i.e.*, repeatedly hashing the same original file using the same hash algorithm will produce the same value.  However, if the original file were to be altered in even a miniscule way, such as cropping a digital photograph to remove even one or two pixels, then the resultant hash value will be completely different.  Examples of hash algorithms include the SHA-1, which produces a 40-character hexadecimal formatted hash value (and example of which is "2fd4e1c67a2d28fced849ee1bb76e7391b93eb12"), and the MD5, which produces a 32-character hexadecimal formatted hash value (an example of which is "79054025255fb1a26e4bc422aef54eb4").

## "BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

8.     On March 27, 2018, your affiant began an investigation of the dynamic IP

Address 173.53.88.22, from which your affiant downloaded child pornography on March 16,

2018, between 1754 hrs and 1806 hrs GMT -4[1], using an automated software program used to

search peer-to-peer (P2P) networks on the Internet.  This software program is a free version of

BitTorrent that has been configured to download from a single source (single source refers to

downloading from a single IP address, as opposed to multiple IP addresses as the default P2P

---

[1] Greenwich Mean Time (GMT) is the mean solar time at the Royal Observatory in Greenwich, London, which is also called Coordinated Universal Time (UTC).  For clarity sake, time zones around the world are often referenced to GMT.  As used above, "GMT-4" represents Eastern Standard Time (EST) in the United States.

configuration for most P2P applications), record packet traffic, and display geographic locations of IP addresses.

9.      Your affiant reviewed the evidence and observed that the automated program successfully achieved a direct connection with IP address 173.53.88.22 on March 16, 2018, between 1754 hrs and 1806 hrs GMT -4.  The automated program browsed the files currently being shared by that IP address during the aforementioned undercover sessions.  The undercover sessions began on March 16, 2018, at 1754 hrs GMT -4, through 1806 hrs GMT-4.  The automated program attempted to browse the suspect computer sharing confirmed child pornography files based on SHA1 Values.[2]  On March 16, 2018, at 17:52:06 GMT -4, the automated program successfully achieved a direct connection with IP address 173.53.88.22 and browsed the files currently being shared by that IP address.  Based on known child pornography SHA1 Values, the automated program successfully downloaded several BitTorrent files.

10.      Your affiant reviewed the uploaded file information and capture logs, which revealed that the upload on March 16, 2018, between 1752 hrs and 1806 hrs GMT -4, occurred solely from the dynamic IP Address 173.53.88.22.  Your affiant conducted a check of the American Registry for Internet Numbers ("ARIN") and determined that Verizon holds the registration for IP Address 173.53.88.22.

11.      I reviewed the aforementioned files to determine whether they contained child pornography.  Pertinent to that review, I would note that I have received law enforcement

---

[2] Previously identified child pornography photographs that are widely circulated on the Internet will, if unaltered, always have the same hash values, which enables investigators to quickly identify other instances of the same offending images.

training regarding the identification of images that constitute child pornography as that term is defined under federal law, and as mentioned in the Introduction above I have led or participated in dozens if not hundreds of child pornography investigations. One file I reviewed in particular was named "LSM08 – FULL," which is comprised of eight sub folders, each of which contain a series of images depicting two prepubescent females. Based on my training, experience and review of those images, I determined that there were multiple image files that constituted child pornography, specifically, the lascivious exhibition of the genitals, as those terms are defined under federal law. Four of the files that I observed, all of which involve the same pair of nude, prepubescent girls, are described as below:

a. File name: lsm-001_020.jpg. The image file shows the focus of the genitals of two prepubescent females between the approximate ages of 6 and 11 years old. The females are nude and lying down on a pink fabric with flowers printed on it and spreading their legs apart. The girls' genitals are a focal point of the photograph;

b. File name: lsm-001_037.jpg. The image file shows two nude prepubescent females between the approximate ages of 6 and 11 years old. One of the females is standing on the bed with her left leg raised in the air exposing her genitals; her right hand is holding the right hand of the second female. The second female is standing on the ground next to the bed with her right calf touching her left knee and her toes are resting on a potted tree. The bedspread is a pink fabric with flowers printed on it.

c. File name: lsm-004_066.jpg. The image file shows two prepubescent females between the approximate ages of 6 and 11 years old. One of the females is lying nude on the floor with pink anklets around her ankles. She has lifted her buttocks up thereby exposing her genitals. The second female is on top of the first female so they are face to face, on her hands and toes with white socks and a white top, and her genitals are exposed as well. The floor is wooden or wood laminate, there are beige couches in the background, and a glass table next to the females.

11

d.   File name: lsm-004_065.jpg. The image file shows two prepubescent females between the approximate ages of 6 and 11 years old. The females are sitting down side by side on the wooden or wood laminate floor and leaning back on a beige couch. One female is wearing white socks and a white top and the other female is wearing pink anklets on her ankles. Both females are raising one of their legs and the raised legs are coming together at the feet to touch the foot of the other female. Both females have their other leg bent toward them exposing their genitals, which are a focal point of the photograph. There is a glass table next to them.

12.   Based on this information, an administrative subpoena, authorized by the Office of the Attorney General for the Commonwealth of Virginia, was submitted to Verizon on March 27, 2018, requesting subscriber information for the Verizon user assigned IP address 173.53.88.22 during the aforementioned timeline during which the files of child pornography were shared.

13.   Results from the administrative subpoena revealed the following information about IP address 173.53.88.22 during the aforementioned timeframe: (1) the subscriber was "Jennifer Hurst"; (2) the address listed for the account was the SUBJECT PREMISES; and (3) the listed email address was jahwender@gmail.com. Furthermore, Verizon reported that the local area network ("LAN") Internet router media access control ("MAC") address for the equipment assigned to this account is 48:5d:36:2c:9d:13. Verizon records indicated that the dynamic IP address 173.53.88.22 was assigned to the SUBJECT PREMISES beginning on at least September 15, 2017, at 23:38:27, through March 27, 2018, at 08:15:36. A property search of Richmond City property assessment was inquired for the SUBJECT PREMISES, which indicated that the property owner is James David Wender.

14.     A search of publically available records indicates that James Wender is associated with 903 Pine Ridge Road, Richmond, VA 23226, in Henrico County, as well as the SUBJECT PREMISES in the City of Richmond.

15.     Your affiant conducted a search of records of the Virginia Division of Motor Vehicles ("DMV") regarding the name "James Wender." Virginia DMV records indicate that James David Wender has a registered address of 903 Pine Ridge Road, Richmond, VA 23226, in Henrico County. DMV records also indicate that James Wender has three vehicles registered in his name; a 2013 Ford pickup bearing Virginia registration "ZKJ-3478," a 2007 Volkswagen Rabbit bearing Virginia registration "VDL-7596," and a 2007 FJ Cruiser bearing Virginia registration "KJD-1296." The listed address of all three vehicles is 903 Pine Ridge Road, Rich  nd, VA 23226.

16.       search of publically available records indicates that Jennifer Hurst-Wender is registered to the SUBJECT PREMISES in the City of Richmond. One search indicated that Jennifer Hurst-Wender began living at the SUBJECT PREMISES in November 2010. A search of the Virginia Employment Commission records indicated that Jennifer Hurst-Wender is employed by Association for the Preservation of Virginia Antiquities.

17.     Your affiant conducted a search of records of the Virginia Division of Motor Vehicles ("DMV") regarding the name "Jennifer Hurst." Virginia DMV records indicates that Jennifer Ann Hurst-Wender currently resides at the SUBJECT PREMISES in the City of Richmond. DMV records indicate that Jennifer Ann Hurst-Wender has a 2000 Mazda B3000 registered in her name bearing Virginia registration "XKJ9907." The listed address of the vehicle is the SUBJECT PREMISES.

13

18.     A search of publically available records indicated that Neena Zahava Bracha Maizels resides at SUBJECT PREMISES in the City of Richmond.  One search indicated that Neena Zahava Bracha Maizels began living at the SUBJECT PREMISES in December 2017.  A search of the Virginia Employment Commission records indicated that Neena Zahava Bracha Maizels is employed by Chippenham and Johnston-Willis Hospital, Inc.

19.     Your affiant conducted a search of records of the Virginia Division of Motor Vehicles ("DMV") regarding the name "Neena Zahava Bracha Maizels."  Virginia DMV records indicate that Neena Zahava Bracha Maizels, resides at 2017 Old Prescott Court; Richmond, VA 23238, in Henrico County.  DMV records also indicate that Neena Zahava Bracha Maizels has a 2007 Toyota Rav4 registered in her name bearing Virginia registration "NZB."  The listed address of the vehicle is 22017 Old Prescott Court, Richmond, VA 23238.

20.     On April 11, 2018, Investigator Troy Payne, Hanover County Sheriff's Office, contacted the Richmond Police Department Computer Crimes Unit regarding the investigation of the dynamic IP Address 173.53.88.22 assigned during the time-frame discussed below. Investigator Payne is assigned to the SOVA ICAC Task Force and the FBI Child Exploitation Task Force. Investigator Payne had previously requested to target the same IP Address on which I had predicated my own investigation, *i.e.,* 173.53.88.22, for the active distribution of child pornography on March 16, 2018, between 1754 hrs and 1806 hrs.[3]  Investigator Payne also used

---

[3] It appears that Investigator Payne's downloading of the same child porn images on the same date during the same time-frame from the same IP address as your affiant was coincidental. Your affiant's BitTorrent program was set up to scan for known child pornography images using a library of hash values and search autonomously for those files from computers located in the Richmond area. Presumably, Investigator Payne's BitTorrent tool was operating in the same mode. Any child pornography downloads to your Affiant's and Investigator Payne's computers would be effected by whatever computers in the Richmond area using BitTorrent and possessing

14

a version of BitTorrent software that had been configured to download files from a single source, record packet traffic, and display geographic locations of IP addresses.

21.     Your affiant reviewed the evidence provided by Investigator Payne and observed that the automated program successfully achieved a direct connection with IP address 173.53.88.22 beginning on March 16, 2017, between 1754 hrs and 1806 hrs GMT -4. The automated program browsed the files currently being shared by that IP address during the aforementioned undercover sessions. The undercover sessions began on March 16, 2017, between 1754 hrs and 1806hrs GMT -4. The automated program attempted to browse the suspect computer sharing confirmed child pornography files based on SHA1 Values. On March 16, 2017, between 1754 hrs and 1806 hrs GMT -4, the automated program successfully achieved a direct connection with IP Address 173.53.88.22 and browsed the files currently being shared by that IP Address. Based on known child pornography SHA1 Values, the automated program successfully downloaded a BitTorrent file named "LSM08 – FULL." As previously indicated in paragraph 13, Verizon records indicated that the dynamic IP address 173.53.88.22 was assigned to the dwelling located at the SUBJECT PREMISES beginning on at least September 15, 2017, at 23:38:27, through March 27, 2018, at 08:15:36. Your affiant observed the following file name "LSM08 – FULL" which is comprised of eight sub folders, each of which contain a series of images of nude and partially clothed prepubescent females posed in various positions exposing their genitals. These are the same files previously described by your affiant in paragraph 11.

---

child pornography images with those hash values were actually connected to the Internet at the time of your Affiant's and Investigator Payne's respective searches. It has been my experience that such date/time/file download coincidences, while not common, do occasionally occur involving investigators in more than one jurisdiction.

22.     On April 12, 2018, your affiant conducted a spot surveillance of the dwelling

located at the SUBJECT PREMISES, in the City of Richmond and photographed the exterior of

the residence (see attached image in Attachment A).  Your affiant observed that the residence is

a single-family residential dwelling.  The structure is comprised of siding that is greenish-gray in

color.  The front door is a purplish-maroon in color and there is a glass screen door with a white

frame.  There is a white awning above the front door and that has a hanging plaque with the

letters "1707" affixed to it.  Your affiant observed a Subaru with a Virginia license plate

"VDG4462" and a Toyota with a Virginia license plate "NZB" parked in driveway of the

residence.

23.     During the surveillance and while standing directly in front of the SUBJECT

PREMISES, your affiant used a wireless network detection device and detected approximately

nine wireless networks operating in the immediate vicinity of the SUBJECT PREMISES, in the

City of Richmond.  All of the nine wireless networks were secured with encryption.  There were

three networks that were labeled with the prefix "FiOS," which your affiant is aware is a Verizon

product.  Your affiant is also aware that Verizon requires account holders to log onto all "FiOS"

Wi-Fi networks using their account credentials and passwords, thereby making all Verizon

"FiOS" Wi-Fi networks secure.  Further, while standing directly in front of the SUBJECT

PREMISES, the secure network with one of the strongest Wi-Fi signals was named "FiOS-

7QZJR-5G."  Further, that network was also broadcasting that its Internet router MAC address

was 48:5d:36:2c:9d:14.  As described above in Paragraph 13, Verizon reported that the local area

network (LAN) Internet router media access control (MAC) address for the equipment assigned

to this account is 48:5d:36:2c:9d:13.  The strongest Wi-Fi signal named "FiOS-7QZJR-5G" is

the companion Wi-Fi area network (WAN) Internet router MAC address reported by Verizon in Paragraph 13 of this Affidavit.

24.     On April 13, 2018, at approximately 0500 hrs, your affiant conducted another spot surveillance of the SUBJECT PREMISES, in the City of Richmond. Your affiant observed four vehicles in the driveway; a Subaru with a Virginia license plate "VDG4462," a Toyota with a Virginia license plate "NZB," a Mazda with Virginia license plate "XKJ9907," and a Toyota with Virginia license plate "JPR7492." DMV records indicates that the 2002 Mazda Protégé bearing VA registration "VDG4462" is registered to Ahmed Usman Khalil at the listed address of 101 N. 5th Street Apt 514; Richmond, VA 23219. DMV records indicates that the 2000 Toyota Avalon bearing VA registration "JPR7492" is registered to John Allen Richardson at the listed address of 8 Holly Street; Onancock, VA 23417.

25.     Taken together, the above information indicates that on March 16, 2018, between 1752 hrs and 1806 hrs GMT -4, a person using a computer(s) located at the SUBJECT PREMISES, in the City of Richmond, was using a computer(s) with the dynamic IP address 173.53.88.22 assigned on March 16, 2018, between 1752 hrs and 1806 hrs GMT -4 to download, store, and distribute child pornography files through a file-sharing program on the BitTorrent Network. Based on information provided in this Affidavit, your affiant believes that probable cause exists that child pornography is being stored on a computer(s) in the possession of one or more individuals who resides at the dwelling located at the SUBJECT PREMISES."

17

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO ACCESS WITH INTENT TO VIEW, COLLECT, RECEIVE CHILD PORNOGRAPHY AND SEEK TO SEXUALLY EXPLOIT CHILDREN

26.     Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who utilize web-based sites to seek children to sexually exploit them by having sexual encounters or obtaining images of child pornography:

a.      Individuals who access with intent to view, possess, collect, receive and distribute child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.      Individuals who access with intent to view, possess, collect and receive child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Individuals who access with intent to view, possess, collect and receive child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.      Likewise, individuals who access with intent to view, possess, collect and receive child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer

18

and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e. Individuals who access with intent to view, possess, collect and receive child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f. Individuals involved in sexually exploiting children and who would have knowledge about how to access a hidden and embedded bulletin board would have gained knowledge of its location through online communication with others of similar interest. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images and children victims of sexual exploitation. Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

g. Individuals who access with intent to view, possess, collect and receive child pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h. Individuals involved in sexually exploiting children sometimes have double lives and concealed forms of communication with these victims. These individuals also create fictitious profiles pertaining to web base accounts such as emails, chatting and forum sites. These individuals with double lives can be involved in children related activities in order to have direct access to new victims. It is common for these individuals to use mobile devices connected to public Wi-Fi internet to communicate with victims and schedule dates for sexual encounters.

i. Individuals who are child predators and sexually exploit children search for children who are vulnerable and easily manipulated. These individuals seek for children with low self-esteem and who are experiencing problems at home.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

27.     Computers and digital technology have dramatically changed the way in which

individuals interested in child pornography interact with each other.  It has also revolutionized

the methods that individuals will use to interact with and sexually exploit children.  Computers

serve four functions in connection with child pornography:  production, communication,

distribution, and storage.

a.      **Production.**  Child pornographers can now transfer printed photographs into a
        computer-readable format with a device known as a scanner.  Furthermore, with
        the advent of digital cameras, when the photograph is taken it is saved as a digital
        file that can be directly transferred to a computer by simply connecting the
        camera to the computer.  The resolution of pictures taken by digital cameras has
        increased dramatically, meaning the photos taken with digital cameras have
        become sharper and crisper.  Photos taken on a digital camera are stored on a
        removable memory card in the camera.  These memory cards typically store many
        gigabytes of data, which provides enough space to store thousands of high-
        resolution photographs.  Video camcorders, which once recorded video onto tapes
        or mini-CDs, now can save video footage in a digital format directly to a hard
        drive in the camera.  The video files can be easily transferred from the camcorder
        to a computer.

b.      **Distribution and Communication.**  A device known as a modem allows any
        computer to connect to another computer through the use of telephone, cable, or
        wireless connection.  Electronic contact can be made to literally millions of
        computers around the world.  The ability to produce child pornography easily,
        reproduce it inexpensively, and market it anonymously (through electronic
        communications) has drastically changed the method of distribution and receipt of
        child pornography.  Child pornography can be transferred via electronic mail or
        through digital methods and protocols to anyone with access to a computer and
        Internet access.  Because of the proliferation of commercial services that provide
        electronic mail service, chat services (*i.e.,* "Instant Messaging"), and easy access
        to the Internet, the computer is a preferred method of distribution and receipt of
        child pornographic materials.

c.   **Storage.** The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The storage capacity of all electronic media, including but not limited to computer hard drives, is growing constantly These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. External and internal hard drives with capacities in the terabyte range are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Media storage devices can easily be concealed and carried on an individual's person.

28.   The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

29.   Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

30.   As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, *i.e.,* by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, *e.g.,* traces of the path of an electronic communication may be automatically

21

stored in many places (*e.g.,* temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

31.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the SUBJECT PREMISES in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

32.     *Probable cause.* I submit that if a computer or storage medium is found in the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Depending on a variety of factors, a particular computer could easily not overwrite deleted files with new data for many months, and in certain cases, conceivably ever.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being

22

used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

33.      *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the

23

sequence in which they were created, although this information can later be falsified.

b.   Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer to engage in a child pornography offense (whether it be to produce, distribute, transport, receive or possess child pornography), the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also

24

likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: 1) data that is evidence of how the computer was used; 2) data that was sent or received; 3) notes as to how the criminal conduct was achieved; 4) records of Internet discussions about the crime; and 5) other records that indicate the nature of the offense.

34.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the SUBJECT PREMISES, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

   a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time in the SUBJECT PREMISES could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

   b.     Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or

25

knowledge will be required to analyze the system and its data in the SUBJECT PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   <u>Variety of forms of electronic media</u>. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

35.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

36.   Because multiple people share the SUBJECT PREMISES as a residence, it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. While on scene investigators will attempt to use methods and techniques that can identify, or at least narrow down, the device or devices on which the evidence may be found. If, however, those triage techniques are unavailable or unsuccessful and investigators nonetheless determine that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## SPECIFICITY OF SEARCH WARRANT RETURN

36.     Consistent with the Court's current policy, the search warrant return will list the model(s) and serial number(s) of any and all computers seized at the SUBJECT PREMISES and include a general description of any and all associated peripheral equipment that has been seized. Additionally, the search warrant return will include the total numbers of each type of digital media that has been seized (*e.g.,* "ten (10) 3.5" diskettes; twenty (20) CDs; twenty (20) DVDs; three (3) USB drives; one (1) 256 MB flash memory card," etc.)

## NOTICE REGARDING INITIATION OF FORENSIC EXAMINATION

37.     Moreover, the Government will file a written pleading in this case within 120 days after the execution of the search warrant notifying the court that the imaging process of digital evidence seized from the target location is complete, and the forensic analysis of computers and media has begun.  Such notice will include confirmation that written notice has been provided to the defendant or his counsel informing the defendant that the forensic examination of evidence seized from him has actually begun.  Such notice to the defendant and the Court is not intended to mean, and should not be construed to mean, that the forensic analysis is complete, or that a written report detailing the results of the examination to date will be filed with the Court or provided to the defendant or his counsel.  This notice does not create, and is not meant to create, additional discovery rights for the defendant.  Rather, the sole purpose of this notice is to notify the defendant that, beyond the simple seizure of his property, a forensic search of that property has actually begun.

## CONCLUSION

38.     Based on the foregoing, there is probable cause to believe that the federal criminal

statutes cited herein have been violated, and that the contraband, property, evidence, fruits and

instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are

located at the SUBJECT PREMISES, described in Attachment A.  I respectfully request that this

Court issue a search warrants for the PREMISES, authorizing the seizure and search of the items

described in Attachment B.


Respectfully submitted,


Mary Gary-Ford
Task Force Officer
Federal Bureau of Investigation


Sworn to me this ___18___ th day of May 2018


/S/
David J. Novak
United States Magistrate Judge

28

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: <br> 1707 Rawlings Street, Richmond, VA 23231 | Case No. 3:18SW120 <br><br> **Filed Under Seal** |

## ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

The location known as 1707 Rawlings Street, Richmond, VA 23231 ("SUBJECT PREMISES")

is identified a single-family residential dwelling. The structure is comprised of siding that is

greenish-gray in color. The front door is purplish-maroon in color and there is a glass screen

door with a white frame. There is a white awning above the front door and that has a hanging

plaque with the letters "1707" affixed to it. See below:



1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN THE MATTER OF THE SEARCH OF:
1707 Rawlings Street, Richmond, VA 23231

Case No. 3:18SW120

FILED UNDER SEAL

## ATTACHMENT B

### EVIDENCE TO BE SEIZED

1.    All records relating to violations of 18 U.S.C. §§ 2251, 2252 and 2252A relating

to the production, distribution, receipt and possession of child pornography, including:

   a.    any and all visual depictions of minors;

   b.    any and all address books, names, and lists of names and addresses of
         minors;

   c.    any and all diaries, notebooks, notes, and any other records reflecting
         physical contact, whether real or imagined, with minors, and any such
         items discussing sexual activities with minors;

   d.    any and all child erotica, including photographs of children that are not
         sexually explicit, drawings, sketches, fantasy writings, diaries, and sexual
         aids;

   e.    records and information relating to communications with Internet Protocol
         addresses **173.53.88.22**.

2.    Computers or storage media used as a means to commit the violations described

above.

3.　　For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.　　evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.　　evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.　　evidence of the lack of such malicious software;

    d.　　evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    e.　　evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    f.　　evidence of the times the COMPUTER was used;

    g.　　passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    h.　　documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    i.　　records of or information about Internet Protocol addresses used by the COMPUTER;

    j.　　records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

        k.      contextual information necessary to understand the evidence described in this attachment.

4.      Routers, modems, and network equipment used to connect computers to the Internet.

5.      Records, information, and items relating to the occupancy or ownership of **1707 Rawlings Street, Richmond, VA 23231**, including utility and telephone bills, mail envelopes, or addressed correspondence.

6.      Records and information relating to the identity or location of the persons suspected of violating the statutes described above.

7.      During the course of the search, law enforcement officials may photograph the searched SUBJECT PREMISES to record the condition thereof and/or the location of items therein.

8.      As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

9.      The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

10.     The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-

3

ROMs, and other magnetic or optical media.